UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WYNN A.D. CHARLEBOIS and<br>WC PRIVATE LLC,<br><br>Defendants. | Civil Action No. _____ |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The U.S. Securities and Exchange Commission ("Plaintiff" or "Commission"), files its Complaint and alleges that:

### SUMMARY

1. This matter concerns the perpetration of a years-long, multi-million dollar Ponzi scheme by Wynn A.D. Charlebois (hereinafter "Charlebois") and his alter-ego entity, WC Private LLC (hereinafter "WC Private") (collectively, the "Defendants"), in which the Defendants obtained money from new investors under false pretenses, and used it to pay previous investors and fund Charlebois' lavish lifestyle.

2. The Defendants' Ponzi scheme and Charlebois' lavish lifestyle were almost entirely dependent on obtaining new investor funds in order to stay afloat.

3. Five civil cases have been filed by investors against Charlebois from May 24, 2021, through April 18, 2022, and demand letters have been served upon him, which have alleged $1.345

1

Million in investor losses due to his misconduct, and which have thus far resulted in more than $500,000 in default judgments against him and the entities he controlled.

## OVERVIEW OF THE DEFENDANTS' PONZI SCHEME

4. Since the early 2000s, Charlebois has held himself out as a self-made investor and a consultant to private businesses. Trading on his social capital in the Charlotte, North Carolina, area, and his network of former co-workers from an investment bank where he was employed decades ago, Charlebois, as early as 2005, solicited investors to provide funds to him for a variety of investment opportunities, executed through a variety of entities he owned and controlled. Among other things, he has successfully solicited investors to enter into loan agreements whereby the funds were used to participate in the purchase and resale of aircraft; promissory notes whereby the funds were to be invested in a variety of private companies; and subscription agreements whereby the funds were to be used for the purchase of shares in a technology company.

5. Most recently, Charlebois has offered investors the opportunity to participate in investments in which profits would be earned through the exercise of stock options he purportedly holds.

6. A review of certain bank records for various Charlebois' accounts over a three year period, from February 5, 2019 through April 30, 2022, reflect that at least $7.1 Million of investor funds flowed into them, of which at least $4.4 million was paid to investors. These accounts reveal a constant cycling and re-cycling of money between business and personal bank accounts in an effort to keep average daily balances up, cover posted transactions, and demonstrate ongoing activity in order to obtain merchant cash advances from various lenders.

7. During this three year period of time, at least $904,528 was paid-out by Charlebois to non-traditional money lenders, such as "Kash Capital", "Last Chance Funding", and

Liquidibee", for short-term, high interest advances against the future revenues of Charlebois entities. During the same time period, there were more than 700 separate non-sufficient fund and overdraft charges for the Charlebois accounts, totaling $39,265 in fees.

8. In addition to paying former investors with new investor money, Charlebois used investor funds to finance his and his family's lifestyle.

9. From May 21, 2019, to April 1, 2022, Charlebois directed investor funds in the amount of $121,996.61 to a private university where one of his children attends school; $65,408 to a private high school where another one of his children attends school; and $2,985 to a social club in Charlotte. Since December 31, 2021, personal mortgage payments in the amount of $8,698.12 have been paid by Charlebois from the WC Private bank account. These payments also came from investor funds.

10. The funds Charlebois received from investors were not invested as he said they would be, and he had no income stream from anything other than the money he received from new investors, loans from personal friends, and merchant cash advance loans.

11. For example, on December 28, 2020, there was a beginning balance of $5,925.29 in the Charlebois' personal joint checking account. That day, an investment of $100,000 was wire transferred into the account from one of his investors. Within 48 hours, Charlebois transferred $93,000 of that investor's $100,000 investment to other Charlebois accounts, of which $81,818.49 was wire transferred to previous investors prior to the end of the year, and $6,195.50 was wire transferred to repay merchant cash advance loans to, among others, Kash Capital and Liquidibee. On the same day, the Charlebois family arrived in Beaver Creek, Colorado, for a vacation, during which time they spent over $9,165, including $1,195.20 for "Vail Limo Service", $1,792.71 for ski access, rentals and purchases, $1,412.45 at restaurants; $1,493.91 at hotels, including the Ritz

Carlton and Park Hyatt (of which $475.00 was charged at the Park Hyatt spa), before they arrived home on January 2, 2021.  By January 4, 2021, the personal joint checking account had a balance of only $263.88 and on January 5, 2021 the same investor made another $100,000 investment into the Charlebois' personal joint checking account and all but $2,190.02 was spent as of January 8, 2021, again paid out via wire transfers to previous investors, wires for payments of merchant cash advance loans, personal expenses, and cash withdrawals.

12. The Charlebois family made a second ski trip to Colorado, also in January 2021, during which time they spent over $3,400 in four days, at places such as the Ritz Carlton Bachelor Gulch, and various restaurants and ski locales in the surrounding Beaver Creek and Vail area.

13. In March 2021, the Charlebois family travelled to Boca Grande, Florida for a week-long vacation, during which time they spent $8,792.41, despite a negative balance in Charlebois' personal joint checking account during the trip.

14. Upon his return to Charlotte on March 22, 2021, through April 13, 2021, Charlebois raised at least $570,000 from investors and obtained $43,000 in new merchant cash advance loans. During this time-period, the Charlebois family traveled to Austin, Texas, and Dallas, Texas (where one of his children attends a private university), and spent over $5,927 during their five day trip. By April 15, 2021, virtually all of the new money Charlebois raised from investors and obtained from loans had been spent paying former investors, repaying merchant cash advance loans, and financing the family's Texas trip, leaving the Charlebois business and personal joint checking accounts near zero balances.  In addition to the aforementioned travel expenditures, Charlebois spent at least $10,993 in airfare during 2021.

15. From in or about November 2021 through the present, the Defendants' Ponzi scheme has defrauded at least three investors of at least $350,000, through the offer of investments in the exercise of stock options in various private entities that Charlebois claimed he owned.

16. Charlebois has made numerous false and fraudulent misrepresentations to investors, and has provided fabricated documents to them, to induce them to invest money with him and the entities he controlled, and has engaged in a repeated pattern of lulling activity with investors once they raised questions about their investment amounts and purported gains.

## VIOLATIONS

17. The Defendants, by virtue of their conduct, directly or indirectly, have engaged in violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

18. The Commission seeks as relief a temporary restraining order, preliminary and permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest thereon, and civil penalties.

## JURISDICTION AND VENUE

19. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b), (c) and (d) of the Securities Act [15 U.S.C. §§ 77t(b)-(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)-(e)], to enjoin the Defendants from engaging in the transactions, acts, practices and courses of business alleged in this Complaint, and transactions, acts, practices and courses of business of similar purport and object, for disgorgement of illegally obtained funds and other equitable relief, and civil monetary penalties.

20. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

21. The Defendants, directly and indirectly, have made use of the mails, the means and instrumentalities of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

22. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the transactions, acts, practices and courses of business constituting violations of the Securities Act and Exchange Act have occurred within the Western District of North Carolina.

## THE DEFENDANTS

23. **Wynn A. D. Charlebois,** age 51, is a resident of Charlotte, North Carolina. He is self-employed and purports to spend his time investing in and consulting for private companies. He is not registered with the Commission.

24. **WC Private LLC i**s a North Carolina corporation, with its principal place of business in Charlotte, North Carolina. WC Private is wholly owned and controlled by Charlebois, and purports to function as a holding company through which Charlebois makes investments.

## THE DEFENDANTS' PURPORTED EXERCISE OF STOCK OPTIONS IN FURTHERANCE OF THEIR PONZI SCHEME

### A. Contours of the Stock Options Iteration of the Defendants' Ponzi Scheme

25. One iteration of the Defendants' Ponzi Scheme was their purported exercise of stock options in certain entities for the benefit of investors, which generally occurred as follows:

26. Charlebois told potential investors that he was a highly successful investor who had previously performed consulting services on behalf of certain private companies, for which he had received stock options to purchase shares in them as compensation.

27. Charlebois had Purchase Agreements in place with the private companies to repurchase the stock options he exercised, at share prices that would result in immediate gains for investors.

28. Charlebois shared his purported Purchase Agreements with some of his investors.

29. The Defendants were going to make sizeable investments in the purchase of shares in the private companies within a matter of days, and would allow a limited number of investors to participate in them.

30. The Defendants would return the full amounts invested by investors plus specified gains on their investments (generally, a 30% return on their investments) within a few months, according to the investment agreements and schedules Charlebois provided to them.

31. The Defendants would personally guarantee the return of the full amount of investors' investments plus their specified gains according to the schedules they provided to them, even if those transactions failed to close on time, or at all.

32. Charlebois told potential investors that he had never been involved in a transaction that failed to close.

33. Unbeknownst to investors, (a) the private companies that Charlebois identified had never issued stock options to him, (b) the private companies that Charlebois identified had never agreed to repurchase their shares from the Defendants, (c) Charlebois fabricated and forged his purported Purchase Agreements with them, and (d) the Defendants never had the requisite funds to support their purported investments in them.

34. Based upon Charlebois' misrepresentations and his false and fictitious documents, investors invested money with the Defendants, by transferring their funds to a Charlebois owned bank account.

35. Unbeknownst to investors, Charlebois transferred their funds to other personal and/or business accounts in which he had an interest, and used them to pay his previous investors and personal expenses.

36. Charlebois would have been unable to pay his previous investors and personal expenses without the funds he received from new investors.

37. When investors questioned Charlebois about the return of their investments and gains, Charlebois repeatedly engaged in lulling activity with them, by falsely claiming, among other things, that (1) he was busy working on other important or time-sensitive business projects, (2) he would turn his attention to their investment transactions shortly, (3) the transactions had closed but the transmittal of funds was delayed, (4) he was unsure how the gains from investors' investments were going to be sent to him, (5) he had previously transferred investors' investment returns and gains from his bank accounts to them, (6) the bank was responsible for any delays in transferring investors' investment returns and gains to them, (7) he would cancel or recall the delayed transfers to investors, and send their money to them by other means; (8) he was experiencing difficulty sending their investment returns and gains to them by other means, for a variety of reasons, and (9) he would add additional interest to investor distributions because of the delays.

38. Charlebois also fabricated bank documents and sent them to some of the investors, to falsely make it appear that the Defendants had previously transferred their investment returns and gains to them.

8

### B. Investor One's Investment

39. As an example, on November 4, 2021, Charlebois contacted one victim, identified herein as **Investor One,** regarding an investment opportunity to participate with the Defendants in the purported exercise of stock options in a private company.

40. Charlebois told **Investor One** that he had earned stock options as a result of his consulting work for a private company in Los Angeles, California, by the name of Nannocare, Inc. ("Nannocare").

41. Charlebois told **Investor One** that the Nannocare stock options had an exercise price of $9.00 per share, and that Nannocare and Charlebois had entered into an agreement whereby Nannocare agreed to repurchase them for $11.75 per share on a date certain, approximately two and one-half months after the exercise of the stock options.

42. Charlebois told **Investor One** that he needed $300,000 to exercise the Nannocare stock options the following day, and that Investor One would earn a gain of approximately 30% on his $100,000 investment.

43. Charlebois provided **Investor One** with a purported Purchase Agreement for the Nannocare shares, which appeared to be signed by Charlebois and Nannocare's CEO.

44. Unbeknownst to **Investor One** at the time, Charlebois' representations were false and fraudulent, and the Purchase Agreement he provided to him was fictitious and forged.

45. On November 4, 2021, **Investor One** made the $100,000 investment, by wire transferring funds to WC Private's bank account.

46. Charlebois immediately wire transferred $87,500 of **Investor One's** investment to his personal joint checking account, and then to another Charlebois-controlled business account, which he used to pay his previous investors.

9

47. By the close of business on November 5, 2021, $81,518.14 of **Investor One's** investment had been wire transferred to Charlebois' previous investors, without **Investor One's** authorization or knowledge.

48. Charlebois engaged in lulling activity with **Investor One** and provided false and fictitious bank documents to him, which appeared to show that Charlebois had previously returned **Investor One's** investment and gain to him.

49. **Investor One** did not receive the return of his investment or gain from the Defendants.

50. Charlebois later admitted to an attorney representing Nannocare that the Purchase Agreement he provided to investors was false and fictitious, and that he prepared it.

**C. Investor Two's Investment**

51. As another example, on January 12, 2022, Charlebois contacted another victim, identified herein as **Investor Two,** regarding an investment opportunity to participate with the Defendants in the purported exercise of stock options in a private company.

52. Charlebois told **Investor Two** that he was preparing to exercise $300,000 worth of stock options he received for the consulting work he performed for Spartan Race, LLC ("Spartan Race"), an entity located in Boston, Massachusetts, and offered **Investor Two** the opportunity to participate in the investment with the Defendants, by funding $50,000 of the investment amount.

53. Charlebois told **Investor Two** that the Defendants would invest funds to purchase Spartan Race shares at an exercise price of $10.00 per share, and that Spartan Race would repurchase them on February 28, 2022, for $13.00 per share.

54. Charlebois told **Investor Two** that the Defendants would personally guarantee that his $50,000 investment would be returned to him on January 21, 2022, and that his $15,000 gain (a 30% return on his investment) would be returned to him on February 28, 2022.

55. Unbeknownst to **Investor Two** at the time, Charlebois' representations were false and fraudulent.

56. On January 13, 2022, **Investor Two** made the $50,000 investment, by wiring funds to WC Private's bank account.

57. Charlebois immediately wire transferred $46,000 of **Investor Two's** investment to his personal joint checking account, which had a balance of $47.93 prior to the receipt of **Investor Two's** funds.

58. From his personal joint checking account, Charlebois wire transferred $9,500 to his previous investors, transferred $5,000 to other Charlebois accounts, and paid $31,084.96 to a private university for tuition and expenses for one of his children via debit card, without **Investor Two's** authorization or knowledge.

59. When **Investor Two** questioned Charlebois about the status of **Investor Two's** investment return and gain, Charlebois engaged in lulling activity with him.

60. **Investor Two** did not receive the return of his investment or gain from the Defendants.

**D. Investor Three's Investments**

61. As another example, on or about **January 18, 2022**, Charlebois told **Investor Three** that he had previously performed professional services for Spartan Race, and received stock options because of it.

62. Charlebois told **Investor Three** that the Spartan Race options had an exercise price of $10.00 per share, and that Spartan Race would repurchase them for $13.00 per share on February 28, 2022.

63. Charlebois told **Investor Three** that the Defendants were going to invest funds in the purchase of Spartan Race shares, and offered **Investor Three** the opportunity to participate in it, by contributing $50,000 towards the investment amount.

64. Charlebois told **Investor Three** that the total amount of WC Private's investment in the purchase of Spartan Race shares was $350,000, and that the Defendants would personally guarantee the return of his $50,000 investment and $15,000 gain (a 30% return on his investment) on February 28, 2022.

65. On January 18, 2022, **Investor Three** made the $50,000 investment, by wire transferring funds to WC Private's bank account.

66. Charlebois immediately wire transferred $41,000 of **Investor Three's** investment to Charlebois' personal joint checking account. Charlebois also wire transferred $5,000 of **Investor Three's** money to his wife's checking account, the majority of which was then transferred from his wife's checking account to the Charlebois' personal joint checking account in a serious of transactions.

67. Between January 18, 2022, and January 21, 2022, Charlebois used $33,000 of **Investor Three's** money to pay former investors from his personal joint checking account via wire transfers. The remainder of **Investor Three's** money in Charlebois' personal joint checking account was used to make loan payments on merchant cash advances, pay insurance premiums, purchase airline tickets, and pay credit card bills.

68. Charlebois' payment of his personal expenses and wire transfers to his previous investors and creditors were undertaken without **Investor Three's** authorization of knowledge.

69. As another example, on or about February 7, 2022, Charlebois told **Investor Three** that he also held stock options in AtmosAir Solutions ("Atmos"), an entity located in Fairfield, Connecticut, for $10.00 per share, which were going to be sold to Atmos on March 31, 2022, for $13.00 per share.

70. Charlebois told **Investor Three** that, upon receipt of his $150,000 investment towards the purchase of Atmos shares, WC Private would invest $500,000 in the purchase, which would include $200,000 of Charlebois' personal funds.

71. Charlebois told **Investor Three** that the Defendants would guarantee the return of his $150,000 investment to him, plus the $45,000 gain he would realize from it (a 30% return on his investment), on March 31, 2022.

72. On February 10, 2022, **Investor Three** made the $150,000 investment, by wire transferring funds to WC Private's bank account, which had a balance of $55.21 before the investment was received.

73. On February 10, 2022, Charlebois wire transferred $88,267 of **Investor Three's** $150,000 investment from WC Private's bank account to his previous investors.

74. That same day, Charlebois wire transferred $60,000 of **Investor Three's** $150,000 investment to his personal joint checking account, at which time he transferred $58,275 to his previous investors.

75. In total, $146,542 of **Investor Three's** $150,000 investment was transferred via wires by Charlebois to his previous investors on the same day he received it, without **Investor Three's** authorization of knowledge.

76. Unbeknownst to **Investor Three** at the time, Charlebois' representations to him about both of his investments were false and fraudulent.

77. Charlebois engaged in lulling activity with **Investor Three** with respect to both of his investments.

78. **Investor Three** did not receive the return of his investment amounts or gains from the Defendants.

**COUNT I—FRAUD BY THE DEFENDANTS**
**Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**

79. Paragraphs 1 through 78 are hereby realleged and are incorporated herein by reference

80. From at least February 2019 through the present, the Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

81. The Defendants knowingly, intentionally, and/or recklessly, engaged in the aforementioned devices, schemes and artifices to defraud.

82. In engaging in such conduct, the Defendants acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

83. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT II—FRAUD BY THE DEFENDANTS**
**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

84. Paragraphs 1 through 78 are hereby realleged and are incorporated herein by reference.

85. From at least February 2019 through the present, the Defendants, in the offer and sale of the securities described herein, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

    a) obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b) engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

86. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

### COUNT III—FRAUD BY THE DEFENDANTS
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

87. Paragraphs 1 through 78 are hereby realleged and are incorporated herein by reference.

88. From at least February 2019 through the present, the Defendants, in connection with the purchase and sale of securities described herein, by use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a) employed devices, schemes, and artifices to defraud;

    b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c) engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

89. The Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, the Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

90. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court:

### I.

Make findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that the Defendants committed the violations alleged herein.

### II.

Issue a temporary restraining order and preliminary and permanent injunctions enjoining the Defendants, and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them:

a. from violating Section 17(a) of the Securities Act [15 U.S.C. 77q(a)]; and,

b. from violating Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]

### III.

Issue a conduct-based injunction that permanently enjoins the Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by Charlebois, from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Charlebois from purchasing or selling securities for his own personal accounts.

### IV.

An order directing the Defendants to pay disgorgement of all ill-gotten gains or unjust enrichment and to pay prejudgment interest on the amount ordered to be disgorged, to effect the remedial purposes of the federal securities laws.

### V.

An Order requiring the Defendants, pursuant to Section 20(d) of the Securities Act [15 U.S.C. 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. 78u(d)(3) and 78u-1], to pay civil monetary penalties.

### VI.

An Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

17

Case 3:22-cv-00223-RJC-DSC   Document 1   Filed 05/19/22   Page 17 of 18

## VII.

Grant such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated: May 19, 2022.	Respectfully submitted,

/s/ *Robert F. Schroeder*
Robert F. Schroeder
Senior Trial Counsel
Georgia Bar No. 001390
Tel: (404) 942-0688
Email: schroederr@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Tel: (404) 842-7622
Email: loomism@sec.gov

COUNSEL FOR PLAINTIFF
U.S. Securities and Exchange Commission
Atlanta Regional Office
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, GA  30326-1382